[No. A116792. First Dist., Div. Four. Mar. 11, 2009.]

THE PEOPLE ex rel. EDMUND G. BROWN, JR., as Attorney General, etc., et al., Plaintiffs and Appellants, v. TRI-UNION SEAFOODS, LLC, et al., Defendants and Respondents.

PUBLIC MEDIA CENTER, Plaintiff and Appellant, v. TRI-UNION SEAFOODS, LLC, et al., Defendants and Respondents.

1550

COUNSEL

Edmund G. Brown, Jr., Attorney General, Tom Greene and Janet Gaard, Chief Assistant Attorneys General, Theodora P. Berger, Assistant Attorney General, Edward G. Weil, Susan S. Fiering and Harrison M. Pollak, Deputy Attorneys General, for Plaintiff and Appellant The People.

Deborah A. Sivas for Plaintiff and Appellant Public Media Center.

Michael E. Wall for San Francisco Medical Society, San Francisco Bay Area Physicians for Social Responsibility, Jane Hightower, M.D., Natural Resources Defense Council, Inc., Oceana, Inc., and Mercury Policy Project as Amici Curiae on behalf of Plaintiffs and Appellants.

Goodwin Procter, Forrest A. Hainline III and Robert B. Bader for Defendants and Respondents.

## OPINION

**REARDON, J.**—There is no dispute that methylmercury is a reproductive toxin that can harm a developing fetus, and that the primary path for human exposure to methylmercury is consumption of fish. All canned tuna distributed by respondents[1] in California contain traces of methylmercury, yet no warnings appear on tuna cans or accompany the sale of canned tuna in this state. This litigation, prosecuted by appellant State of California (State)[2] against the Tuna Companies under the authority of Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code,[3] § 25249.5 et seq.), seeks to require the companies to warn pregnant women and women of childbearing age that they are exposed to methylmercury when they consume canned tuna.

Following a six-week bench trial, with a parade of expert witnesses, the trial court handed the Tuna Companies a complete victory. The trial court ruled that the State was not entitled to any of the relief requested, elaborating three distinct and separate bases: (1) Proposition 65, as applied to the Tuna Companies, was preempted because it conflicts with federal law; (2) the amount of methylmercury in canned tuna does not rise to the threshold level that would trigger the warning requirement for this chemical; and (3) virtually all methylmercury is "naturally occurring," and under the governing regulations does not count toward the threshold exposure; therefore the Tuna Companies are exempt from the warning mandates. The State challenges each ruling. We affirm the judgment on the narrow ground that substantial evidence supports the trial court's finding that methylmercury in tuna is naturally occurring, thereby removing the Tuna Companies from the reach of Proposition 65.

---

[1] Respondents are Tri-Union Seafoods, LLC, Del Monte Corporation and Bumble Bee Seafoods, LLC (the Tuna Companies).

[2] This case has been consolidated with an earlier case filed by appellant Public Media Center. The Attorney General has taken the lead in this litigation. At his request, we have changed the caption to reflect that status, and for convenience refer to both appellants as the State.

[3] Unless otherwise noted, all statutory references are to the Health and Safety Code.

## I. BACKGROUND

A. *Introduction*

 1. *Proposition 65 Regulatory Scheme*

■ Proposition 65, added by voter initiative in 1986, is a "right to know" statute requiring companies that expose consumers to carcinogens or reproductive toxins to provide a warning, subject to specified defenses. Section 25249.6 states that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in Section 25249.10."

■ Proposition 65 directs our Governor to publish a list of chemicals known to the State to cause cancer or reproductive toxicity, and to revise and republish the list annually in light of additional knowledge. (§ 25249.8, subd. (a).) In July 1987, the Governor listed methylmercury as a chemical known to cause reproductive toxicity (Cal. Code Regs., tit. 27, § 27001, subd. (c) (Regulations)), and in May 1996, methylmercury compounds were listed as a chemical known to cause cancer (*id.*, subd. (b)).

■ The warning mandates do not apply in several important situations. There is no duty to warn if federal law preempts state authority for warning of exposure to a particular chemical. (§ 25249.10, subd. (a).) As well, Proposition 65 warning duties are not implicated if exposure to a listed chemical falls below the threshold level established under statutory and regulatory criteria. The defendant must demonstrate "that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer, and that the exposure will have no observable effect assuming exposure at one thousand (1000) times the level in question for substances known to the state to cause reproductive toxicity . . . ." (§ 25249.10, subd. (c).)

■ The "no observable effect level," or NOEL, is a scientific term denoting the maximum dose level at which a chemical is found to have no observable reproductive effect. (Regs., tit. 27, § 25801, subd. (c).) The NOEL is determined through scientific inquiry and assessment as detailed in the framework set forth in the regulations. (*Id.*, §§ 25801, subds. (a), (b)(1), 25803.) In turn, the NOEL is divided by 1,000 to arrive at the maximum allowable dose level (MADL), which is the threshold warning level for a listed chemical. (Regs., tit. 27, § 25801, subd. (b)(1); Health & Saf. Code, § 25249.10, subd. (c).)

■ The procedures for calculating the exposure to a chemical in food start with the quantification of the "chemical concentration of a listed chemical for the exposure in question." (Regs., tit. 27, § 25821, subd. (a).) This concentration is called the " 'level in question.' " (*Ibid.*) The level in question is then multiplied by "the reasonably anticipated rate of exposure for an individual" to the food. (*Id.*, subd. (b).) This rate of exposure must be "based on the pattern and duration of exposure that is relevant to the reproductive effect" which formed the basis for listing the chemical as causing reproductive toxicity. (*Ibid.*) Thus, an "exposure of short duration" is the appropriate frame of reference for a teratogenic chemical. (*Ibid.*) A teratogen is a chemical that can cause birth defects. Methylmercury is a teratogen and that is why it was listed under Proposition 65.

At trial, a defendant can secure the protection of the exposure exemption by establishing (1) the NOEL; (2) the level of exposure in question, and ultimately that the level of exposure was 1,000 times below the NOEL. (§ 25249.10, subd. (c); Regs., tit. 27, §§ 25801, subds. (a), (b)(1), (c), 25803; *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 469 [110 Cal.Rptr.2d 627].)

■ Further, the duty to warn before exposing any person to a listed chemical also escapes activation to the extent a listed chemical is naturally occurring in the food. (Regs., tit. 27, § 25501, subd. (a).) Human consumption of a food is not an " 'exposure' " under Proposition 65 if a defendant can show that the targeted chemical is naturally occurring in food. (Regs., tit. 27, § 25501, subd. (a).) A chemical is naturally occurring only to the extent it does not result from known human activity. (*Id.*, subd. (a)(3).) Thus, where a food contains a chemical that is "in part naturally occurring and in part added as a result of known human activity," only the portion attributable to human activity counts toward the exposure. (*Ibid.*) Finally, to come within the "naturally occurring" rubric, a defendant must prove that the chemical "is a natural constituent of a food" or "is present in a food solely as a result of absorption or accumulation of the chemical which is naturally present in the environment in which the food is raised, or grown, or obtained . . . ." (*Id.*, subd. (a)(1).)

■ Proposition 65 thus requires clear and reasonable warnings absent an exemption under section 25249.10, or a determination that the listed chemical is naturally occurring. The method chosen to convey the warning must "be reasonably calculated . . . to make the warning message available to the individual prior to exposure." (Regs., tit. 27, § 25601.) In addition, the "message must clearly communicate that the chemical in question is known to the state to cause cancer, or birth defects or other reproductive harm." (*Ibid.*)

■ Warnings may be provided using one or more of the following methods: labeling; identification of the product at the retail outlet through shelf labeling, signs, menus, or a combination of these methods; a system of signs, public advertising identifying such system and toll-free information services, or other system that provides clear and reasonable warnings. (Regs., tit. 27, § 25603.1, subds. (a), (b), (d).) Warnings provided by labeling or displayed at a retail outlet must be prominently placed or displayed "with such conspicuousness, as compared with other words, statements, designs, or devices in the label, labeling or display as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use." (*Id.*, subd. (c).)

The Regulations describe "safe harbor" warning messages that are deemed to meet the clear and reasonable standard. (Regs., tit. 27, § 25603.2, subd. (a); *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 918 [12 Cal.Rptr.3d 262, 88 P.3d 1].) The "safe harbor" warning message for a reproductive toxin in a consumer product is this: " 'WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.' " (Regs., tit. 27, § 25603.2, subd. (a)2.)

### 2. *Methylmercury; Methylmercury in Fish*

Methylmercury is a potent neurotoxic agent that can cause harm to a developing fetus. The effects of severe methylmercury poisoning in a fetus include mental retardation, cerebral palsy, small brain size and severe sensory deficits and motor effects. As well, there is evidence that exposure to methylmercury at lower levels affects development of the brain.

Fish is a low calorie source of protein and omega-3 fatty acids and thus is an important component of a healthy diet, but most fish contains methylmercury and some may contain higher levels than others. Omega-3 fatty acids are important in enhancing the growth and development of fetuses. Thus, there is tension between the benefits of consuming fish and the risk of mercury exposure. This tension is borne out by a recent nutritional study involving 135 mother/infant pairs in Massachusetts published by the National Institute of Environmental Health Sciences. Results from the study suggested "that maternal fish consumption during pregnancy may benefit offspring cognition in infancy, but that exposure to higher levels of mercury has adverse effects on child cognition." The researcher recommended that women continue to consume fish during pregnancy, but that they seek out varieties with lower levels of mercury.

Tuna contains methylmercury. The Tuna Companies have stipulated that they have known since at least 1998 that all the canned and packaged tuna products they distribute in California contain detectable traces of methylmercury, and have never provided Proposition 65 warnings on their tuna products.

### 3. *Federal Regulation*

The authority of the federal government to regulate food and food products is anchored in the power of Congress to regulate interstate commerce. (U.S. Const., art. I, § 8, cl. 3.) This authority finds expression in the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. § 301 et seq.), which prohibits the transmission in interstate commerce of any food that is adulterated or misbranded (*id.*, § 331(a), (c)). The Food and Drug Administration (FDA) is entrusted with administering the Act, with authority to promulgate regulations for enforcement of its provisions and conduct hearings, examinations and investigations. (21 U.S.C. §§ 371, 372.) This includes the authority to regulate food labeling, with jurisdiction over labeling of food that is false or misleading in any particular. (*Id.*, §§ 331(a)–(c), 371(a), 343(a).)

The FDA is specifically empowered to regulate the appropriate level of an unavoidable "added" poisonous or deleterious substance in any food by (1) establishing formal tolerances and regulatory limits by regulation, and (2) setting an action level administratively to define a level of contamination at which a food may be deemed adulterated. (21 U.S.C. § 346; 21 C.F.R. § 109.4(a)–(c) (2008).) As well, the FDA is empowered to establish regulations to identify and list foods containing naturally occurring poisonous or deleterious substances which will be considered adulterated under the Act. (21 C.F.R. § 109.4(d) (2008).)[4] Among the criteria for establishing a tolerance for an added poisonous or deleterious substance in food is that the tolerance "is sufficient for the protection of the public health, taking into account the extent to which the presence of the substance cannot be avoided and the other ways in which the consumer may be affected by the same or related poisonous or deleterious substances." (21 C.F.R. § 109.6(b)(2) (2008).) An action level for an added poisonous or deleterious substance in food may be established at a level at which the food is deemed to be adulterated. (*Id.*, § 109.6(d).)

In 1979, the FDA determined that an action level limiting the amount of mercury residues permitted in fish and other aquatic animals to 1.0 part per

---

[4] A naturally occurring poisonous or deleterious substance "is an inherent natural constituent of a food and is not the result of environmental, agricultural, industrial, or other contamination." (21 C.F.R. § 109.3(c) (2008).) An added poisonous or deleterious substance is one that is not naturally occurring. (*Id.*, subd. (d).) A substance becomes an "added" poisonous or deleterious substance when it is increased to abnormal levels through intervening circumstances. (*Ibid.*)

million provided adequate protection to consumers. (44 Fed.Reg. 3990, 3992–3993 (Jan. 19, 1979).) Since the mid-1990's, the FDA has issued advisories on the subject of methylmercury in fish. Most recently, in March 2004 the FDA, in conjunction with the Environmental Protection Agency, promulgated an advisory entitled "What You Need to Know About Mercury in Fish and Shellfish" (<http://www.cfsan.fda.gov/~dms/admehg3.html> [as of Mar. 11, 2009]; the 2004 Advisory).

The 2004 Advisory extols the benefits of fish and shellfish to a healthy diet, noting that these foods contain high quality protein, are low in saturated fat and contain omega-3 fatty acids. However, it also points out that fish and shellfish contain traces of mercury, and some such foods contain higher levels that may harm an unborn baby or a young child's developing nervous system. The 2004 Advisory recommends that the target group, consisting of women who might become pregnant, nursing mothers, pregnant women and young children, "[e]at up to 12 ounces (2 average meals) a week of a variety of fish and shellfish that are lower in mercury." Further, it identifies "canned light tuna" as one source that is low in mercury, and notes that "albacore ('white') tuna has more mercury than canned light tuna." Therefore, when choosing the two meals of fish and shellfish, the 2004 Advisory cautions that the consumer may eat up to six ounces or one average meal of albacore tuna per week.

## B. *Litigation*

In 2004, the State sued the Tuna Companies for injunctive relief and penalties, asserting violations of Proposition 65 and the unfair competition law (UCL).[5] The complaints asserted that the companies distribute and sell canned tuna products in California without providing a clear and reasonable warning that the products contain methylmercury, a chemical known to the State to cause reproductive harm.

At the close of the 24-day bench trial, the superior court issued a 118-page proposed decision to which the State objected. The trial court overruled all but one of the numerous objections, adopted the tentative decision with a minor modification, and issued a further ruling explaining some of its reasoning and conclusions. Ultimately, the court entered judgment dismissing the UCL cause of action and decreeing that the Tuna Companies are not required to provide any Proposition 65 warnings on their tuna products sold in California, or to pay any penalties.

### 1. *Federal Preemption*

The trial court first ruled that any Proposition 65 compliant warning would frustrate the purpose and objectives of the FDA's carefully considered federal

---

[5] Business and Professions Code section 17200 et seq.

approach to advising consumers of both the benefits and possible risks of eating fish; the Tuna Companies could not comply with both federal law and Proposition 65; and thus Proposition 65 as applied to the Tuna Companies in this action was preempted by federal law. Additionally, the trial court determined that the State's proposed warnings failed to comply with Proposition 65.

Significant to the trial court's ruling on federal preemption was a letter sent during the pendency of the action by FDA Commissioner Lester M. Crawford to then Attorney General Bill Lockyer. The commissioner expressed his opinion that the FDA's prior regulatory actions preempted the State's lawsuit. Specifically, he explained that requiring Proposition 65 warnings would frustrate the agency's carefully nuanced approach "to advising consumers of both the benefits and possible risks of eating fish and shellfish; accordingly federal law preempts these Proposition 65 warnings concerning mercury and mercury compounds in tuna." The commissioner's opinion letter relied in part on the 2004 Advisory. The trial court accorded this letter substantial deference.[6]

The trial court's preemption ruling also leaned heavily on a recent California Supreme Court decision concluding that the FDA's approach to warnings on nicotine replacement therapy products embodied a nuanced goal that was in conflict with California's single-minded goal of informing consumers of the products' risks. (*Dowhal v. SmithKline Beecham Consumer Healthcare, supra,* 32 Cal.4th at pp. 934–935.) That conflict justified federal preemption in *Dowhal.* Interestingly, the court located the federal policy in a letter from the FDA responding to and disposing of the plaintiff's citizen's petition. This letter, sent during the pendency of the appeal, rejected the plaintiff's proposed warning and announced that the FDA had adopted a uniform warning to be implemented by the manufacturers. (*Id.* at p. 927.) The court considered the

---

[6] A recent federal appeal decided to the contrary that the FDA had neither regulated the risk of methylmercury in tuna nor the permissible warnings regarding that risk, in a manner that conflicted with the plaintiff's state tort lawsuit. (*Fellner v. Tri-Union Seafoods, L.L.C.* (3d Cir. 2008) 539 F.3d 237, 253.) There, the plaintiff was a consumer diagnosed with mercury poisoning who sued Tri-Union for damages, based on *failure to warn* of the risks of consuming its products. *Fellner* featured and discussed the preemption letter sent by Commissioner Crawford in this case, along with the 2004 Advisory and a compliance guideline, among other items. Tri-Union moved to dismiss on federal preemption grounds. At the company's behest, the trial court took judicial notice of the above documents. Unlike the trial court in the instant case, the *Fellner* court determined that the FDA's informal views on preemption as expressed in the commissioner's letter were not persuasive and the circumstances of the letter suggested it merited a particularly low level of deference. In particular, the reviewing court pointed out that the letter did not purport to be the product of any agency proceeding, and expressed views that had never before been expressed by the agency in a most informal manner, namely a letter offering a legal theory for the California litigation. (*Fellner, supra,* at pp. 250–251 & fn. 8.)

letter to be a definitive ruling on the subject, and was not dissuaded by the fact that it was not published in the Federal Register. (*Id.* at pp. 927–928.)

### 2. *Threshold Warning Level*

Second, the trial court ruled that the Tuna Companies met their burden of showing that they were exempt from the Proposition 65 warning mandate because the exposure of the average woman of childbearing age and/or pregnant woman to methylmercury in the companies' products fell below the MADL for the chemical. In the battle of experts at trial, the trial court accepted the MADL of 0.3 micrograms per day advanced by the Tuna Companies' expert, which was higher than that advocated by the State.

Significantly, the court also adopted the companies' formula for calculating the concentration of methylmercury per average serving size, which the parties stipulated was 64.4 grams. This formula used a weighted average of methylmercury concentration in both light and albacore canned tuna, weighted according to the percentage of women of childbearing age in California who eat each type. The result was a *blended* mean concentration of 0.239 to 0.257 micrograms/grams of methylmercury in canned tuna products. The State challenged reliance on the blended mean, arguing for resort to the actual highest concentration of methylmercury in canned tuna to which a woman may be exposed. The argument boiled down to each side's interpretation of the governing Proposition 65 regulations.

Moreover, the court credited the approach of the Tuna Companies' expert of *dividing* the per serving exposure by 60, the average frequency with which women of childbearing age consume canned tuna in California. This calculation yielded an exposure of 0.26 to 0.28 micrograms of methylmercury per day, below the MADL of 0.3 micrograms per day. The State took the position that the law does not permit averaging the exposure to a teratogen like methylmercury. It urged that a single exposure could cause harm, and thus the single day exposure was the proper unit of comparison to the MADL. The court found this calculation inappropriate and concluded that the Regulations do not prohibit averaging the exposure to a reproductive toxin.

### 3. *Naturally Occurring Ruling*

Finally, the trial court concluded that the Tuna Companies met their burden of demonstrating that they are exempt from the Proposition 65 warning requirements, finding that "virtually all" methylmercury in canned tuna is naturally occurring and therefore does not count toward the exposure to the chemical.

The court made two rulings concerning the "naturally occurring" issue. First, relying heavily on *Nicolle-Wagner v. Deukmejian* (1991) 230 Cal.App.3d 652 [281 Cal.Rptr. 494],[7] it interpreted what is now section 25501 of the Regulations as including within the "naturally occurring" rubric those chemicals in food that are the result of both natural *and uncontrollable human activity*. It is undisputed that the Tuna Companies do not add methylmercury to canned tuna products, and there is no process to remove the chemical from canned tuna.

Next, it accepted the Tuna Companies' experts whose testimony, taken together, supported the conclusion that methylmercury in tuna is not a product of human activity (pollution) and thus its presence in tuna is naturally occurring. This conclusion derived largely from scientific studies showing that there has been no increase in the amount of methylmercury in ocean fish over the past 100 years despite the rise in atmospheric mercury due to anthropogenic[8] sources.

## II. DISCUSSION

The State challenges all three rulings described above. In order to win this appeal, it must defeat each ruling. Ultimately the third ruling frames a substantial evidence question. While reasonable minds could differ on the outcome at the trial level, we view the trial court findings through the filter of the highly deferential substantial evidence test, a test that is difficult to overcome. We uphold the judgment solely on our conclusion that substantial evidence supports the trial court's finding that methylmercury is naturally occurring in canned tuna.

A. *Facts Relevant to the Finding That Methylmercury in Tuna is Naturally Occurring*

1. *Mercury in the Environment*

Mercury is an element on the periodic table found throughout the environment. Inorganic mercury exists in the environment in three oxidation states:

---

[7] The court in *Nicolle-Wagner* upheld the naturally occurring regulation against a facial challenge. In the process it acknowledged that ballot arguments indicated that "Proposition 65 sought to regulate toxic substances which are *deliberately added* or put into the environment by human activity." (*Nicolle-Wagner v. Deukmejian, supra*, 230 Cal.App.3d at p. 659, italics added.) In the court's view the regulation was narrowly drawn, and took pains to define " 'naturally occurring' " in such a way as to preclude chemicals which are, in whole or part, the product of human activity. (*Id.* at p. 661.)

[8] "Anthropogenic" means "of, relating to, or resulting from the influence of human beings on nature <~pollutants>." (Webster's Collegiate Dict. (10th ed. 2001) p. 49.)

elemental mercury, in both liquid and gas forms, and mercury I and mercury II. The primary form of mercury emitted by power plants into the atmosphere is the gaseous form of elemental mercury. Methylmercury is not known to be emitted from power plants.

Mercury comes into the atmosphere from natural sources, e.g., volcanoes and mineralized areas; there is also an anthropogenic contribution from pollution. Once in the atmosphere, mercury can be readily dispersed and enter the oceans and other aquatic systems through atmospheric deposition. There is a global cycling of mercury whereby elemental mercury emits into the atmosphere, is oxidized into ionic mercury (mercury II), and becomes more soluble in water, falling on the earth and oceans as rain. Mercury that is deposited terrestrially can leach from watersheds and enter rivers, with delivery to coastal regions by river flow and transfer from those regions to the open oceans. This process can have both natural and anthropogenic components, as can groundwater input. Finally, hydrothermal inputs are another natural source of mercury in the oceans.

The cycling of mercury has existed since prehistoric times, independent of human activity. There is an equilibrium such that the amount of mercury that evades up into the atmosphere matches the amount that is deposited on the earth and aquatic surfaces. Thus, increases of mercury deposits in the oceanic layers will match the increases in atmospheric mercury.

Experts testified that since the industrial revolution, atmospheric mercury has increased by a factor of three (Tuna Companies), or within a spread of two to four (State).

Ionic mercury (mercury II) is the form of mercury that can convert into methylmercury through the process of methylation.[9] Methylmercury is an organic form of mercury in which the element is bound directly to a carbon atom in an organic compound.

### 2. *Methylmercury in Ocean Fish*

The world's oceans are vast. Scientists have classified the oceans into three depth-specific layers. The surface or mixed layer comprises waters that are mixed by the winds to the depth of about 100 meters. The middle layer, from approximately 100 meters to 1,000 meters in depth, is the thermocline.

---

[9] According to the Oxford English Dictionary Online (<http://www.dictionary.oed.com> [as of Mar. 11, 2009]), "methylate" means "[t]o introduce one or more methyl groups into (a compound or group)." (Draft rev. Dec. 2001.) "Methylation" in turn is described as "[t]he process of introducing one or more methyl groups into a compound; an instance of this." (Draft rev. June 2008.)

Temperatures decrease the deeper one goes and then become roughly constant in the deep ocean, which is about 1,000 to 4,000 meters in depth.

Methylmercury is the major form of mercury found in fish. It bioaccumulates in fish over time. Thus, as fish become larger, the level of methylmercury in the fish increases. All canned tuna contains trace amounts of methylmercury. As well, methylmercury in fish is the main source of human exposure to mercury.

### 3. Museum Fish Studies

Dr. Francois Morel, an expert for the Tuna Companies on the naturally occurring phenomenon, apprised the court of three studies that compared methylmercury concentrations in museum fish samples with modern fish samples. The premise of these studies was this: If methylmercury was formed in oceanic systems from the deposition of industrial mercury pollution, then there should be a higher concentration of methylmercury in modern fish than in museum fish caught prior to the industrial age.

The three studies—each published in a peer-reviewed journal—demonstrated that methylmercury concentration in ocean fish has not increased over time, notwithstanding increased contributions of mercury into the atmosphere due to manmade pollution. There were weaknesses and limitations in these studies, including the fact that the fish compared in one study were not of the same species and were not caught in the same area. As well, one study of museum and modern fish analyzed a fish that lives 2,000 to 3,000 meters deep in the ocean and has high levels of methylmercury. Anthropogenic pollution would not be expected at such depths because very little of the mercury deposited from the atmosphere into the oceans settles to the deep ocean. Nonetheless, of significance to Dr. Morel was the fact that both samples of fish had very high levels of mercury, and the lack of change was consistent with the idea that the concentration was unaffected by pollution.

### 4. Kraepiel Study

In 1998, Dr. Morel and his colleagues conducted the "Kraepiel study" to test whether methylmercury concentrations in ocean fish has increased along with global emissions of atmospheric mercury. This study compared yellowfin tuna caught near Hawaii in 1971 and 1998; an article devoted to the research model, findings and conclusions of this study was published in a peer-reviewed scientific journal in 2003. The researchers used a three-box model (or Kraepiel model) to test hypotheses concerning *where* mercury in the ocean is methylated—in the surface or mixed layer, the thermocline, or

the deep ocean. The three boxes represented the three layers of the ocean in the target area. Mercury species were transported from one box to the other by water advection and vertical particulate transport. Dr. Morel testified that although simple, the three-box model was scientifically appropriate and sufficient to provide valid results.

The Kraepiel model was designed to predict the range of increase in methylmercury in the mixed and thermocline layers between 1971 and 1998. Those were the two depth-specific layers in which most scientists hypothesized that methylation of mercury would occur.[10] On the basis of the known increase in global emissions of mercury over the past century and using a simple model of mercury biogeochemistry in the targeted ocean area, the team calculated the range of increase in methylmercury concentration in the surface waters that should have occurred over the 27-year span if methylation occurred in the mixed layer or in the thermocline.

The gist of the study was that if mercury is methylated in the mixed or thermocline layers, and assuming an increase in atmospheric mercury from pollution and a concurrent deposition of mercury on the ocean over the 27-year period, one would expect that the concentration of methylmercury in tuna caught in the same general area would increase between 1971 and 1998.

The assumption that there had been an increase in atmospheric mercury during the period 1971 to 1998 was based on published scientific data. Further, the Kraepiel study took into account whether that increase was linear or exponential, and whether there had been a rise and a stabilization.

The results of the study revealed that concentrations of methylmercury were on average *slightly less* in the 1998 tuna than in the 1971 tuna. From the data the authors rejected the hypotheses that methylmercury was formed in the thermocline or mixed layers, the only two hypotheses that were consistent with an anthropogenic contribution to the formation of methylmercury.

### 5. *Possible Sources of Methylation*

There is no agreed or certain answer to the source of methylmercury in the oceans and hence in fish. Possible sources include the deep ocean, the mixed layer and the thermocline. The Kraepiel study cast doubts on all sources except the deep ocean. Based on the results of the study, the authors hypothesized that methylmercury is formed in the deep ocean, either in

---

[10] The scientists' main interest was in the thermocline layer. Very few have argued that mercury is methylated in the mixed layer. Methylmercury degrades rapidly in the mixed layer because it is exposed to sunlight. The deep ocean was not a strong contender because the impact of anthropogenic mercury in the deep ocean is "operatively negligible."

hydrothermal vents or the deep sediment. Dr. William Fitzgerald, the State's expert, also produced a recent paper that suggested for the first time that coastal sediments along the continental shelf could be a possible source of methylmercury in ocean fish.[11]

Methylation of mercury has not been observed in deep ocean sediments. However, ocean hydrothermal vents are present in every ocean; they exist at different levels of depth and thus allow for distribution of methylmercury in the ocean waters. Dr. Morel described hydrothermal vents as areas "where volcanic activity brings material to the sea floor, and . . . the water . . . spewing out . . . is completely anoxic.[12]" These are areas "of intense redox[13] reactions because of this anoxic water coming in." Dr. Morel has conducted experiments that have shown that mercury can be methylated chemically under high temperature and pressure—conditions similar to those found in hydrothermal vents. According to Dr. Morel, DNA samples from some organisms resident in deep sea vents have a methylmercury resistant gene which would detoxify the chemical.

Both Dr. Morel and Dr. Fitzgerald have found methylmercury in hydrothermal vents and agree that deep ocean vents are a major source of methylmercury in the oceans. According to Dr. Fitzgerald's calculations, hydrothermal vents could produce enough methylmercury to account for approximately four times the amount that bioaccumulates in ocean fish each year. One study that he participated in found methylmercury below the thermocline, and that levels increased with an increase in ocean depth. A deep ocean fish, the *antimora rostrata*, contains high levels of methylmercury.

If deep ocean hydrothermal vents are the source of methylmercury in the ocean, then 100 percent of the chemical would be naturally occurring. Dr. Fitzgerald has stated that if these vents are the major source, then changes in mercury pollution would have little effect on the content of methylmercury in ocean fish.

---

[11] Dr. Morel was critical of this work, explaining that the transfer of methylmercury from the coast to the open ocean would be inefficient. From what is known of the geochemistry of trace minerals in the ocean where no effect of coastal inputs to the middle of the ocean has been seen, Dr. Morel expressed that it seemed "absolutely impossible" that coastal methylmercury is the source of the chemical in the open ocean.

[12] "Anoxic" means "greatly deficient in oxygen: oxygenless . . . ." (Webster's Collegiate Dict., *supra*, p. 48, capitalization omitted.)

[13] "Redox" reaction refers to an oxidation-reduction reaction. (Webster's Collegiate Dict., *supra*, at p. 980.) "Oxidation-reduction" means "a chemical reaction in which one or more electrons are transferred from one atom or molecule to another." (*Id.* at p. 830.)

B. *Standard of Review*

 It was the Tuna Companies' burden to show, by a preponderance of the evidence, that methylmercury in canned tuna is naturally occurring. (Regs., tit. 27, § 25501, subd. (a); Evid. Code, § 115.) A party required to prove something by a preponderance of the evidence "need prove only that it is more likely to be true than not true." (CACI No. 200.) Preponderance of the evidence means " 'that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, *not necessarily in number of witnesses or quantity*, but in its effect on those to whom it is addressed.' (Italics added.)" (*Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 325 [276 Cal.Rptr. 430], fn. omitted.) In other words, the term refers to "evidence that has more convincing force than that opposed to it." (BAJI No. 2.60.)

When findings of fact are challenged on appeal, we are bound by the familiar and highly deferential substantial evidence standard of review. This standard calls for review of the entire record to determine whether there is any substantial evidence, contradicted or not contradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427], abrogated on another point in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668 [85 Cal.Rptr.2d 292, 976 P.2d 843].)

The substantial evidence rule applies equally to expert and lay testimony. Thus, expert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence in the record (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1137 [73 Cal.Rptr.2d 695]), or upon matters not reasonably relied upon by other experts (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135). Further, an expert's opinion testimony does not achieve the dignity of substantial evidence where the expert bases his or her conclusion on speculative, remote or conjectural factors. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 [50 Cal.Rptr.2d 785].) When the trial court accepts an expert's ultimate conclusion without critically considering his or her reasoning, and it appears the conclusion was based on improper or unwarranted matters, we must reverse the judgment for lack of substantial

evidence. (*Pacific Gas & Electric Co. v. Zuckerman, supra*, 189 Cal.App.3d at p. 1136.) On the other hand, the trial court is free to reject testimony of a party's expert, so long as the trier does not do so arbitrarily. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 [85 Cal.Rptr.2d 386].)

## C. Analysis

### 1. Attack on Kraepiel Study

As it did below, the State attacks the Kraepiel study on several fronts. The three main thrusts of criticism are as follows: (1) comparability issues: the two 1971 data sets differed significantly, and the 1971 and 1998 fish were not comparable for a variety of reasons; (2) there was no net increase in atmospheric mercury between 1971 and 1998; and (3) the study design was flawed because it used a three-box model.

#### a. Comparability Issues

First, pointing out that two sets of fish with different methylmercury levels were combined for the 1971 cohort, the State argues that this disparity demonstrates that there were unaccounted-for factors that could affect the level of the toxin in the fish.[14] However, the Kraepiel study authors ran their calculations excluding the suspect data, *with no change in the results*. Moreover, the set of fish containing higher levels of methylmercury contained larger fish than the other set. It would be expected that larger fish would have higher levels of methylmercury because the contaminant bioaccumulates.

The State also urges that another expert, Dr. Dean Grubbs, identified a number of confounding factors not accounted for in the Kraepiel study that could have affected levels of the contaminant in the 1971 and 1998 fish. Dr. Grubbs theorized that seasonal and climate factors could have affected the study results, but had no direct evidence on any of these points. The trial court properly rejected this testimony as too conjectural. (*Leslie G. v. Perry & Associates, supra*, 43 Cal.App.4th at p. 487.)

Similarly, the trial court rejected as not credible the State's evidence that the difference in location where the 1971 and 1998 cohorts were caught was a confounding factor denigrating the study results. Dr. Grubbs opined that the

---

[14] The State grounds this argument in the testimony of its expert statistician, Dr. Sander Greenland.

diets of the two groups could have varied due to the fact that one group was caught within 20 miles from the coast of Hawaii and the other was caught offshore beyond the 50-mile mark. According to Dr. Grubbs, this was a possible confounding factor that could have compromised the results. Dr. Grubbs's work with tuna involved studying the stomach content of tuna caught in fish aggregating devices, but only approximately 5 percent of Hawaiian tuna is associated with fish aggregating devices. As to the other 95 percent, Dr. James Josephs, an expert in tuna biology, tuna population and dynamics and tuna fisheries, testified to the effect that the distances at which the 1971 and 1998 tuna were caught would not present a confounding factor due to the highly migratory nature of tuna—they swim constantly, never rest, and are built for speed, i.e., they can swim up to 50 to 60 miles per hour. Further, they eat constantly and are opportunistic feeders, eating whatever is available to them. Therefore, food intake on any given day is not relevant to the tuna's bioaccumulation of methylmercury over time.

b. *Increase in Atmospheric Mercury*

Second, the State faults the premise of the Kraepiel study that atmospheric mercury levels increased between 1971 and 1998. The State refers to Dr. Fitzgerald's testimony that there was roughly the same amount of mercury depositions in 1971 as in 1998. On the other hand, according to Dr. Morel, the data showed that mercury levels peaked around 1990 and then declined, with a leveling off in 1998. However the level of mercury was higher "when it starts to level off even in 1995" than at the beginning point of the study. Moreover, if methylmercury were formed in surface water or at the thermocline, the increase in methylmercury up through 1990 would "carr[y] on" because it takes time for the methylmercury concentration in the water column to change. Thus, the trial court's finding that *total atmospheric mercury emissions* increased between 1971 and 1998 was supported by the evidence.

In its statement of decision, the trial court noted that Dr. Fitzgerald revised his report from no change in atmospheric mercury between 1971 and 1998 to no change between 1979 and 2000 or 2001. Moreover, the expert's own work and testimony refuted his argument that certain data points measuring pollution should not have been included because they reflected local pollution that skewed the results. That is to say, Dr. Fitzgerald admitted that elementary mercury, from whatever sources, is emitted into the atmosphere, resides there for a year, travels around the earth and is dispersed "rather broadly." As well, Dr. Fitzgerald testified that natural and anthropogenic mercury is found in sediments of pristine Arctic lakes, thus casting doubt on the argument that regional variability is a relevant factor. Finally, data collected by Dr. Joseph Pacyna—a scientist considered well regarded by Dr. Fitzgerald—indicated

that mercury emissions increased from 1990 to 2000, with a large increase coming from Asia. As the trial court observed, until at least the year 2001, Dr. Fitzgerald agreed with Dr. Pacyna that total anthropogenic mercury emissions increased in that timeframe.

The State complains that there was no indication that the court "properly weighed the countervailing evidence," citing *Estate of Larson* (1980) 106 Cal.App.3d 560, 567 [166 Cal.Rptr. 868]. The record shows the opposite— that the trial court considered the conflicting views of Dr. Morel and Dr. Fitzgerald—and made the choice, on substantial evidence as cited above, that the evidence did not support Dr. Fitzgerald's opinion that there was no increase in mercury emissions during the span of the Kraepiel study. Additionally, responding to the State's objections to its tentative statement of decision, the trial court took the opportunity to reinforce its original determinations and factual findings. The court took pains to underscore that the findings were based on evidence in the case, not "made of whole cloth," and that it *did* undertake a credibility assessment, finding certain experts more credible than others based on reasons that were not arbitrary.

### c. *Three-box Model*

Finally, the State takes issue with the Kraepiel model. First, it asserts that "Dr. Morel . . . admitted that his theory 'could be all wrong.' " (Italics omitted.) Dr. Morel was asked whether the model could be all wrong. What he said was this: "So, yes, it could all be wrong. [¶] . . . [¶] . . . But what we do is try to explore the domain of likely processes and parameters . . . . We don't just say this is a model. Here are the parameters. Let's run it and get a result. [¶] We say this is a model. Now let's reflect on what could be wrong and the eventual parameters. So although it could be wrong, we think we have explored the range of likely possibilities . . . ." As well, Dr. Morel testified without equivocation that he was satisfied from his research that there was no (0 or 1.5 to 2 percent) anthropogenic contribution to methylmercury in the ocean. According to Dr. Morel, the conclusion that the methylmercury in tuna is naturally occurring is not a hypothesis; it is "a reasonable scientific certainty."

Next, as it did below, the State challenges the design of the three-box model, emphasizing that Dr. Fitzgerald criticized the model as not representing reality but only generating hypotheses to guide research. To begin with, the Kraepiel study was published in a peer-reviewed journal, and properly formed a basis supporting Dr. Morel's opinions. (*People v. Bui* (2001) 86

Cal.App.4th 1187, 1195 [103 Cal.Rptr.2d 908] [expert properly based opinion on epidemiological studies he conducted, which resulted in published papers subject to peer review].) Second, declining to credit the State's criticism, the trial court noted that it is common for scientists, including Dr. Fitzgerald, to use simple models in their work with oceans. Further, Dr. Morel explained that the three-box model was selected for the purpose of determining the *range* of possibilities, not exact values; a simpler model allows the scientist to "vary . . . parameters very easily[,] and easily see what they do." The model also factored in assumptions that mercury level increases were linear, exponential, or rose and then stabilized.

The State is correct that the Kraepiel study did not determine the origin of methylation in the ocean, but that does not render the study too speculative or conjectural on the issue of whether methylmercury in the ocean environment responds to human pollution. The State confuses the evidence that there is no anthropogenic contribution to methylmercury in ocean fish with hypotheses concerning the source of methylmercury in the ocean. Although the source(s) of methylmercury remains has yet to be nailed down, every study that has tested whether methylmercury in tuna has anthropogenic contribution has concluded it is naturally occurring. In any event, Dr. Morel and Dr. Fitzgerald both agree that deep ocean vents are a source of methylmercury in the deep ocean.

## 2. *Dr. Morel's Posttrial Statements*

### a. *Graduate Student Poster*

Additionally, the State maintains that Dr. Morel changed his opinion after trial and that the trial court abused its discretion in declining to reopen trial to admit new evidence of his opinions. According to the State, Dr. Morel made statements on a poster[15] presented at an international conference on mercury to the effect that methylation in the thermocline could be an important source of methylmercury. The facts are these: Eileen Ekstron, a graduate student of Dr. Morel's, presented a poster at the conference. Dr. Morel did not attend the conference, prepare the poster or present it, although he was listed as an author. Dr. Morel declared that his name was on the poster because he was

---

[15] A poster is a large sheet of paper displayed on a board that contains summaries of findings through a combination of text, figures and photographs. A poster is not a peer-reviewed document.

involved in planning and designing the experiments conducted on two ocean cruises, and it is "customary" to include the name of an advisor as the last author on a poster.[16] Dr. Morel reviewed the poster and was readily familiar with the information on it. He indicated that posters often are used at scientific meetings for presentations by students of their preliminary results and conclusions. He was familiar with the results of the two cruises and concluded that they did not evoke positive evidence that methylation occurs in the thermocline and may be an important source of methylmercury in the ocean. Rather, his opinion today is consistent with that expressed at trial, namely "that the fact that significant methylation has only been observed in incubation bottles under anoxic conditions provides negative evidence for mercury methylation occurring in the [oxygen minimum zone]." Further, he did not agree with Ms. Ekstron's conclusion that direct measurement of methylmercury in hydrothermal vents implied that vents probably are not a significant source of methylmercury in the ocean, opining that her calculations were "subject to potential errors of unknown magnitude, due in large part to the complexity of the 'plumbing' of hydrothermal vents."

From our review of the record, it is apparent that the trial court did not abuse its discretion in declining to reopen the trial to admit Dr. Morel's "new opinions."

### b. *Smithsonian Magazine Article*

We granted the State's request, set forth in its reply brief, to take judicial notice of a Smithsonian Magazine article that includes a statement by Dr. Morel, and a characterization of a statement by Dr. Morel, concerning the source of methylmercury in the ocean. His statement: "Right now, I'd say nobody has found a source of methylmercury in the ocean that can easily account for what we find in terms of methylmercury in open ocean fish. . . . It's been hard to figure out where it's coming from, where's [*sic*] it's going. Now we are beginning to understand." The characterization: "Even Morel, who served as a key witness for the tuna companies in the San Francisco case, now says that vents don't make up enough methylmercury to supply it to surface fish. But this realization in itself, he says, still doesn't explain where the majority of mercury comes from." (Jaffe, *Mystery at Sea*

---

[16] The State submitted the declaration of Dr. James Hurley, one of the cochairs of the conference. He stated: "Individuals listed on the poster or any abstract submitted . . . are understood to be those who actively participated in the research and who support the statements on the poster or the abstract. Generally, the final 'author' on academically-based abstracts or posters is understood to be the supervising scientist if the abstract or poster is submitted by a student. While posters . . . are not peer-reviewed documents . . . , they are considered to be accurate representations of the views of the individuals who are listed as authors."

(Sept. 27, 2007) Smithsonian Magazine (<http://www.smithsonianmag.com/science-nature/mercury.html?c=y&page=2> [as of Mar. 11, 2009]).)

Opposing the State's request for judicial notice, Dr. Morel declared that the quoted statement was inaccurate because he did not make the statement. He indicated it was *not* his opinion that deep ocean vents do not make up enough methylmercury to supply it to surface fish. Further, he reiterated that his "opinion at trial was that the best scientific evidence supports the conclusion that it is more probable than not that deep ocean vents are the source for virtually all of the methylmercury in tuna, which was supported by calculations from the State's expert witness . . . ." It appears that the State confuses the *evidence and finding* that there is no anthropogenic contribution to methylmercury in tuna with the *hypotheses* about the *source* of methylmercury in the ocean. Evidence was presented at trial that a possible source of methylmercury is deep ocean vents, but this theory is still a hypothesis.

### D. *Conclusion*

The State's weakest link to victory in this litigation has been its attack on the ruling that methylmercury in tuna is naturally occurring. It may well be that there was substantial evidence that *less than* 98 to 100 percent of methylmercury in tuna is naturally occurring, i.e., a greater percent is from anthropomorphic sources, as the State urges. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429–430, fn. 5 [102 Cal.Rptr.2d 157].) The experts on both sides were eminent scientists who had published major peer-reviewed articles. The trial court sided with the Tuna Companies' experts, found them more credible, and afforded their testimony greater weight than it afforded that of the State's experts. The court explained its reasoning. We have reviewed the statement of decision and the record and cannot say that there is no substantial evidence to support the trial court's conclusion, under the preponderance of the evidence standard, that methylmercury in tuna is naturally occurring. When substantial evidence supports the trial court's decision, as it does here, we have no power to substitute our own deductions or preferred set of facts.

It bears contemplating, however, whether the truth about complex, threshold scientific issues encompassed within Proposition 65—such as whether methylmercury in fish is naturally occurring—is best derived by application of the substantial evidence rule to the testimony and opinions of dueling experts serving partisan commitments. The public has a significant health and welfare interest in the accurate determination of these issues based on the whole scientific truth of the matter—or as near to the whole truth as is possible. More than a century ago our Supreme Court proposed that rather than relying on expert witnesses called by the parties, the trial courts should

summon a disinterested body or board of experts to give their opinion and reasons therefore to the court and jury regardless of the consequences to either litigant. (*Estate of Dolbeer* (1906) 149 Cal. 227, 243 [86 P. 695].) Our Evidence Code now provides for a similar remedy, authorizing courts to appoint experts to investigate and render a report on the matter in question, subject to cross-examination by the parties. (Evid. Code, §§ 730, 732.) Resort to such a procedure could reduce the risk of a decision based on anything but the most valid scientific investigation and assessment.

Finally, we clarify the reach of our decision today. The trial court ruled for the Tuna Companies on three alternative grounds, entering judgment that the companies are not required to provide Proposition 65 warnings on their canned tuna products or pay any penalties, and therefore there is no underlying cause of action upon which an unlawful business practices claim can be based. We have confined our ruling to only one of those grounds, namely the conclusion that virtually all methylmercury is naturally occurring. Further, within that ruling, we have confined our decision to the substantial evidence question. Within the broader naturally occurring issue, we further declined to review the trial court's decision interpreting the pertinent regulation as including within the "naturally occurring" rubric those chemicals in food that are the result of both natural and uncontrollable human activity.

 Where, as here, a court of first instance renders its judgment on alternative grounds and the reviewing court affirms on only one of those grounds, the grounds not considered are not conclusively established. Thus, *this court's judgment is conclusive only as to the substantial evidence determination on the naturally occurring issue.* (*Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club* (2006) 140 Cal.App.4th 1120, 1132 [45 Cal.Rptr.3d 207] (*Newport Beach*); see *Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 79 [70 Cal.Rptr.3d 817]; *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1460 [92 Cal.Rptr.2d 521]; but see *DiRuzza v. County of Tehama* (2003) 323 F.3d 1147, 1156.)

As the *Newport Beach* court explained, the traditional rule provides that a general affirmance of a judgment on appeal renders it res judicata as to all issues, claims or controversies encompassed in the action and passed on by the lower court, even though the reviewing court does not consider or decide upon all of them. (*Newport Beach, supra,* 140 Cal.App.4th at p. 1126.) This rule finds its source in the early California law opinion in *People v. Skidmore* (1865) 27 Cal. 287. The modern rule, embedded in the Restatement Second of Judgments, section 27, comment *o*, provides that where the reviewing court upholds one of the determinations but refuses to consider whether the others are sufficient and accordingly affirms the judgment, that judgment is conclusive as to the first determination. Notwithstanding that *Skidmore* has

not been expressly overruled, the *Newport Beach* court declined to follow it, reasoning that "[t]he traditional rule is inconsistent with an appellate court's duty under the California Constitution, article VI, section 14 to set forth its decisions in writing 'with reasons stated.' Giving conclusive effect to both of two alternate grounds for a judgment, when the Court of Appeal expressly declines to address one ground, undermines the credibility and accuracy of the decision." (*Newport Beach, supra,* 140 Cal.App.4th at p. 1132.) As well, modern case law has effectively dissipated the strength and viability of *Skidmore.* (*Newport Beach, supra,* at p. 1131.)

And, notwithstanding our affirmance today that substantial evidence supports the trial court finding that methylmercury in tuna is naturally occurring, there are potential scenarios that could possibly lead to a renewed Proposition 65 claim against the Tuna Companies or similar companies that would survive res judicata and collateral estoppel challenges. For example, the Office of Environmental Health Hazard Assessment (OEHHA), the lead agency designated by the Governor to implement the provisions of Proposition 65, could amend the regulations to *except* the presence of methylmercury in canned tuna from the naturally occurring rules. (Regs., tit. 27, § 25102, subd. (*o*); see § 25249.12, subd. (a).) Similarly, the determination of whether methylmercury in tuna is naturally occurring could be lodged with the OEHHA and its scientific advisors, rather than left to dueling expert witnesses in a trial court setting. Moreover, we must recognize that scientific research on issues such as the source of methylmercury in the ocean is ongoing, and a trial court determination on whether and/or to what extent methylmercury in tuna is naturally occurring is based on the state of the scientific inquiry *at a given point in time.* Therefore, unlike findings based on an historical occurrence such as facts giving rise to a tort or a crime, findings based on scientific inquiry and research can easily become dated and outmoded as science develops and new research explains the phenomena in question more thoroughly and completely. " 'Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement.' " (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 590 [125 L.Ed.2d 469, 113 S.Ct. 2786] [construing the term " 'scientific . . . knowledge' " as used in rule 702 of the Fed. Rules of Evid. (28 U.S.C.) governing admissibility of expert testimony].) The high court captured succinctly the essential difference: "[T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly." (*Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* at pp. 596–597.)

### III. DISPOSITION

We affirm the judgment solely on the ground that substantial evidence supports the trial court's finding that methylmercury in tuna is naturally occurring, and hence the Tuna Companies are exempt from the warning requirements of Proposition 65.

Ruvolo, P. J., and Sepulveda, J., concurred.