Filed 3/11/26  P. v. Meza CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUAN JAVIER MEZA,<br><br>        Defendant and Appellant. | B341480<br><br>(Los Angeles County<br>Super. Ct. No. BA212674) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Keith H. Borjon, Judge.  Reversed and remanded with instructions.

        The United Firm, Seth R. Hancock and Georgina Gannon for Defendant and Appellant.

        Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Defendant and Respondent.

---

**INTRODUCTION**

Juan Javier Meza appeals the denial of his motion under Penal Code section 1473.7 to vacate his 2001 guilty plea to corporal injury to a spouse or cohabitant.[1]  In his motion, Meza explained that he had served his sentence and his conviction had been expunged, he continued living openly in the United States while being gainfully employed, and he submitted unrebutted declarations attesting he did not understand the immigration consequences of his plea until 20 years later when he sought to obtain legal status.  The People filed no written opposition and presented no evidence.  The superior court denied Meza's motion because he did not provide a declaration from his defense counsel at the time of his plea or his counsel's case file, despite Meza's diligent efforts in attempting to contact his prior counsel, who had retired since representing him.

After independent review, we conclude Meza met his burden of establishing, by a preponderance of the evidence, error affecting his ability to "meaningfully understand, defend against, or knowingly accept" the immigration consequences of his plea. (§ 1473.7, subd. (a)(1).)  Meza also established a reasonable probability he would have rejected his plea had he understood the consequences.  Accordingly, we reverse the denial of Meza's motion and direct the superior court to vacate Meza's conviction.

---

[1]    Undesignated statutory references are to the Penal Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Conviction and Sentence*

In January 2001, Meza "became involved in a serious argument" with the mother of his two children, Susana Zavala Gonzalez.  Meza struck Gonzalez in the face, grabbed her around the neck with both hands, and bruised her thigh and breast.  He also pulled the telephone from the wall to prevent Gonzalez from contacting law enforcement.

Meza was charged with two felony counts: corporal injury to a spouse or cohabitant (count 1; § 273.5, subd. (a)) and dissuading a witness by force or threat (count 2; § 136.1, subd. (c)(1)).  The complaint alleged that Meza was convicted within the previous seven years of a section 273.5 offense in 1997.  (See § 273.5, subd. (f)(1) ["A person convicted of violating this section for acts occurring within seven years of a previous conviction under subdivision (a) . . . shall be punished by imprisonment in a county jail for not more than one year, or by imprisonment in the state prison for two, four, or five years, or by both imprisonment and a fine of up to ten thousand dollars"].)

In February 2001, before a preliminary hearing occurred, Meza pleaded guilty to count 1, and count 2 was dismissed.  During the plea hearing, the prosecutor stated:  "Mr. Meza, if you're not a United States citizen, pleading today will cause problems with immigration.  You will not be able to become a citizen. . . .  You will not be able to have any type of legal status here.  You will be deported.  And you will not be able to come back into the country if you leave.  Do you understand all these consequences?"  Meza answered, "Yes."

Meza was sentenced to 180 to 365 days in county jail and five years of probation and ordered to complete a year-long domestic violence counseling program. Meza successfully completed probation and domestic violence counseling, as well as a six-month drug treatment and alcohol counseling program. After completing probation, Meza petitioned the court for expungement, requesting to reduce his felony charge to a misdemeanor (see § 17) or to withdraw his plea of guilty and dismiss the action (see § 1203.4). At the recommendation of the probation department, the trial court granted Meza's expungement petition, although it is not clear from the record on what ground.[2]

B.      *Section 1473.7 Motion To Vacate*

In January 2024, Meza (through counsel) moved to vacate his conviction under section 1473.7, subdivision (a)(1). Meza asserted he did not understand the immigration consequences of his guilty plea because "neither the court nor his attorney advised him that this type of conviction requires mandatory deportation, denial of naturalization, and permanent exclusion." At the time of his motion, Meza was unable to obtain the reporter's transcript from his plea hearing.

Meza provided a personal declaration stating he was born in Mexico, he arrived in the United States in 1991 at "about 12 years old," and he was not a United States citizen and did not have legal status in the United States. Meza attended school in

---

[2]      The grant of relief under section 1203.4 "has no effect on the federal immigration consequences of [a] conviction." (*People v. Martinez* (2013) 57 Cal.4th 555, 560; see *Ramirez-Castro v. I.N.S.* (9th Cir. 2002) 287 F.3d 1172, 1174-1175.)

4

the United States and "worked [his] entire adult [life] in the United States since the age of 18," including as a cab dispatcher, a taxi driver, a dishwasher, and a busser. Meza declared that at the time of his guilty plea in 2001, he had two young children (both United States citizens) of two and four years old, and his father was also living in the United States. As of 2024, Meza had three adult children (one deceased), financially supported his parents, including his United States resident father, and lived with and financially supported his partner of 12 years and her two children. Meza declared, "The United States is my home and it has been since the age of 12."

Meza averred that his defense attorney did not "mention[] any immigration consequences for pleading guilty" but instead advised him that "this was the best deal because it allowed [Meza] to avoid more time in custody." Meza declared he did not understand the immigration consequences until he consulted with an immigration attorney after he completed his sentence, and had he "known that the case was going to cause these severe consequence[s], [he] would have requested [to] seek other options such as an immigration safe plea or tak[ing] the case to trial. I would have been willing to risk going to trial and getting more time in jail if it meant I could avoid these severe immigration consequences."

The People did not file a written opposition nor did they present any argument on the merits of Meza's motion, other than stating, "We oppose." Before the hearing, the parties located the reporter's transcript from Meza's plea hearing, which reflected the prosecutor's immigration advisement. Meza filed a supplemental brief in support of his motion, explaining that he reached out to his public defender and requested the defense file,

but these efforts were unsuccessful.  Meza explained that on May 22, 2024 his counsel "emailed a Deputy Public Defender in the Immigration Unit of the Los Angeles County Public Defender's Office to inquire about what advisements, if any, were given to Mr. Meza by his Deputy Public Defender at the time of his plea," and learned that the public defender who represented Meza in 2001 "had recently retired."  The public defender's office offered "to try to contact" the retired attorney and "to search for the defense file."  As of June 4, the public defender's office stated that "after an exhaustive search, the defense file for Mr. Meza's case could not be located," and as of August 8, the retired attorney "had not responded to [the public defender's office's] efforts to contact her."

Meza also provided a supplemental declaration stating he had "no recollection of any mention of immigration consequences" at his plea hearing, even after reviewing the plea hearing transcripts, which he believed indicated "that [he] wasn't truly understanding everything when the statements were made."[3] Meza averred:

> "During the plea . . . I was scared and nervous because I knew I was pleading to a felony with jail time.  During the conversation with the Judge, I remember saying 'yes' and 'no' to the different

---

[3] Meza's declaration stated that "the Judge discussed immigration consequences with me" at the plea hearing, and his attorney similarly stated at the section 1473.7 hearing that "the court" advised Meza of immigration consequences.  As stated, however, the reporter's transcript reflects that the prosecutor gave Meza the immigration advisement at the plea hearing.

questions in order to just get through the plea and get the case over with. . . .

"At the time of my plea, I did not think that immigration consequences were a possibility for a few reasons.  First, I had a previous conviction from 1997, and no immigration consequences had come as a result of it.  Second, I was of the belief that if the Court was sending me to jail and putting me on probation, that was the full extent of the consequences.  I thought that if I did everything the Court told me to do, I would not face any additional consequences.  Last . . . my attorney told me that I was getting the best deal possible.  Since my attorney thought this was the best deal, I believed her.

"I first found out about the immigration consequences of my plea when I reached out to an Immigration firm about two years ago.  They told me that I could not proceed with any immigration applications because of my convictions.  As soon as I found out, I hired [another firm] to see if there was any way to fix the criminal convictions since I didn't know there were immigration consequences for them that would prevent me from adjusting my status."

The superior court heard the motion to vacate on August 22, 2024.  Meza argued that even though he was advised of mandatory immigration consequences during the plea hearing, there was no evidence that his defense attorney advised him on

immigration matters, and Meza's declaration established that he did not subjectively understand the immigration consequences of his plea at the time of his conviction. As stated, the People opposed Meza's motion by stating, "We oppose."

Interpreting the case law, the superior court believed that even if a section 1473.7 petitioner was notified of mandatory immigration consequences, he could be eligible for relief if he was also "misadvised . . . as to immigration consequences" by his defense counsel. But in Meza's case, the court observed that "all we have as to defense counsel's files is a file that [is] silent on th[e] question o[f] immigration consequences" and there is "no declaration from counsel." The court stated that in Meza's declaration, "there's no explanation as to how [he] came to this misunderstanding" of the immigration consequences, and there was no "corroborat[ion] [of] any of [the declaration's] assertions." The court added, "at the time of the plea in this case, defense counsel in California had no obligation [to give] advice regarding immigration consequences . . . unless asked about it by their client. There's no evidence before [the court] that Mr. Meza asked his counsel about immigration consequences, so counsel was under no obligation to advise him."

The court concluded that Meza understood the immigration advisement given by the prosecutor, because he "acknowledged understanding the advisement," "did not express any concerns about possible deportation, denial of naturalization, or reentry," and "did not seek any additional time to consult with counsel" about immigration consequences. Accordingly, the court denied Meza's motion to vacate.

Meza timely appealed.

## DISCUSSION

A.      *Immigration Consequences of a Section 273.5 Conviction*

"Under federal law, a noncitizen convicted of a crime of domestic violence is deportable.  (8 U.S.C. § 1227(a)(2)(E)(i).)" (*People v. Villalba* (2023) 89 Cal.App.5th 659, 666 (*Villalba*).) This includes an offense under section 273.5, subdivision (a). (See *id.* at pp. 666-667; *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 903 (*Manzanilla*).)

A section 273.5 conviction is also a crime of violence under federal immigration law.  (*Villalba, supra,* 89 Cal.App.5th at p. 667; *Banuelos-Ayon v. Holder* (9th Cir. 2010) 611 F.3d 1080, 1083; see 18 U.S.C. § 16(a).)  If a defendant is sentenced to a term of imprisonment of at least one year (365 days) for a crime of violence, the offense qualifies as an aggravated felony conviction. (*Villalba*, at pp. 666-667; *Manzanilla, supra,* 80 Cal.App.5th at pp. 903-904.)  This designation carries even harsher consequences.  "A noncitizen who is convicted of an aggravated felony at any time after admission is conclusively presumed deportable and is subject to mandatory removal.  (8 U.S.C. § 1228(c); see *id.*, § 1227(a)(2)(A)(iii).)  An aggravated felony conviction renders a noncitizen 'ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country.  See [8 U.S.C. §] 1229b(a)(3), (b)(1)(C).  Accordingly, removal is a virtual certainty for a[] [noncitizen] found to have an aggravated felony conviction, no matter how long he has previously resided here.' " (*Villalba*, at pp. 666-667; accord, *Manzanilla*, at p. 904.)

9

B.  *Section 1473.7 and Standard of Review*

"[S]ection 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*).)  "[T]o establish a 'prejudicial error' under section 1473.7, a person need only show by a preponderance of the evidence:  1) he did not 'meaningfully understand' or 'knowingly accept' the actual or potential adverse immigration consequences of the plea; and 2) had he understood the consequences, it is reasonably probable he would have instead attempted to 'defend against' the charges." (*People v. Mejia* (2019) 36 Cal.App.5th 859, 862 (*Mejia*).)  A preponderance of the evidence means evidence with more " 'convincing force' " than the opposing evidence (*People v. Miller* (1916) 171 Cal. 649, 653) or evidence which is more likely to be true than not true (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567).

As to the first prong, "the focus of the inquiry . . . is on the '*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States.' " (*Mejia, supra*, 36 Cal.App.5th at p. 871; accord, *People v. Padron* (2025) 109 Cal.App.5th 950, 958 (*Padron*); see *People v. Lopez* (2022) 83 Cal.App.5th 698, 713-714 (*Lopez*) ["At the heart of the prejudicial error analysis 'is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken' "].)  There is

10

"no additional need to establish [the petitioner's] mistake was caused by some 'third party.' " (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 769 (*Alatorre*); accord, *People v. Carrillo* (2024) 101 Cal.App.5th 1, 16 (*Carrillo*).)  For instance, a defendant may show, but is not required to show, that he received ineffective assistance of counsel.  (*People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1067; accord, *Padron*, at p. 959; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1008 (*Camacho*); see § 1473.7, subd. (a)(1).)

Accordingly, the California Supreme Court has instructed that "[a] party seeking relief under section 1473.7 is not required to provide the declaration of plea counsel" or "to submit contemporaneous documentation from the time of the plea. Rather, the inquiry under section 1473.7 requires consideration of the 'totality of the circumstances,' which necessarily involves case-by-case examination of the record [citation], and no specific kind of evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at p. 325.)  Even a court's advisement that a guilty plea will result in immigration consequences "d[oes] not preclude [a petitioner] from demonstrating that []he did not meaningfully understand the immigration consequences of h[is] plea." (*People v. Curiel* (2023) 92 Cal.App.5th 1160, 1175 (*Curiel*) [collecting cases].)

As to the prejudice prong, "a defendant must demonstrate a 'reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences' [citation] and must corroborate any assertions with ' " 'objective evidence.' " ' " (*Espinoza*, *supra*, 14 Cal.5th at p. 316; accord, *People v. Vivar* (2021) 11 Cal.5th 510, 530 (*Vivar*).)  " ' "A 'reasonable probability'

11

'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " ' " (*Lopez*, *supra*, 83 Cal.App.5th at p. 714; accord, *Padron*, *supra,* 109 Cal.App.5th at p. 959; *People v. Soto* (2022) 79 Cal.App.5th 602, 610.)

Prejudice turns on the "totality of the circumstances," with "particularly relevant" factors including "the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra,* 11 Cal.5th at pp. 529-530.) Additional factors can include "the defendant's remaining ties or lack thereof to his or her home country [citations], the defendant's immigration status in the United States at the time of the plea [citations], the defendant's criminal history [citations], and the defendant's employment history." (*Lopez*, *supra*, 83 Cal.App.5th at p. 714.) Prejudice can include a showing that if the petitioner had known of the immigration consequences, he "would have risked going to trial (even if only to figuratively throw a ' "Hail Mary" ')." (*Mejia*, *supra*, 36 Cal.App.5th at p. 871; see *Lopez*, at pp. 714-715 ["while the probability of obtaining a more favorable result at trial may be one factor a court considers in determining prejudice, it is not controlling or necessarily even the most important factor courts consider"].)

We independently review the denial of a section 1473.7 motion. (*Vivar*, *supra*, 11 Cal.5th at p. 527; *Padron*, *supra*, 109 Cal.App.5th at p. 959.) " '[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' " (*Vivar*, at p. 527.) If the superior court heard testimony, we "give particular deference

12

to [any] factual findings based on the trial court's personal observations of witnesses." (*Id.* at pp. 527-528.) But "[w]here, as here, the facts derive entirely from written declarations and other documents . . . , there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding. [Citation.] Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Vivar*, at p. 528, fn. omitted.)

C.    *Meza Established He Did Not Meaningfully Understand the Immigration Consequences of His Plea*

Meza argues that he established error affecting his understanding of his conviction's immigration consequences, because he was previously convicted of a section 273.5 violation without immigration problems, his counsel failed to advise him of immigration consequences, and he did not understand the trial court's immigration advisement. He contends there is "no evidence that [his] counsel discussed immigration consequences with him, much less that she discussed immigration consequences in a specific and accurate fashion."

We conclude Meza has demonstrated, by a preponderance of the evidence, that he did not understand the immigration consequences of his guilty plea. Meza attested he did not understand the immigration consequences of his conviction because his attorney did not advise him of the consequences and told him he was "getting the best deal possible," because he was previously convicted of the same offense "and no immigration

13

consequences had come as a result," and because he believed jail and probation were "the full extent of the consequences." Meza asserted he did not recall hearing the advisement on immigration consequences because he was "scared and nervous . . . [of] pleading to a felony," leading him to believe he "wasn't truly understanding everything when the statements were made." (See *Carrillo*, *supra*, 101 Cal.App.5th at p. 17 [petitioner "is the only one with direct access to his state of mind and his declaration asserted he 'did not meaningfully understand the immigration consequences of being convicted' "].) Meza also declared that he did not understand that he was ineligible for naturalization until he "reached out to an [i]mmigration firm" in 2022, and they informed him he "could not proceed with any immigration applications because of my convictions."

Meza's declaration is corroborated by the available record. The record establishes that Meza was previously convicted of violating section 273.5 in 1997, supporting his assertion that his experience with the 1997 conviction impacted his understanding of the consequences flowing from the 2001 conviction. After completing his sentence and his court-ordered treatment, Meza also successfully petitioned the court for expungement of his conviction. (See *Camacho*, *supra*, 32 Cal.App.5th at p. 1009 ["It was only after [petitioner's] conviction was expunged and reduced to a misdemeanor that [he] consulted an immigration attorney . . . [and] then learned of the true immigration consequences of his plea"].)

Similarly, the record supports that Meza did not comprehend the mandatory immigration consequences of his conviction until he pursued changing his immigration status in 2022. (See *Curiel*, *supra*, 92 Cal.App.5th at p. 1177 [petitioner's

14

"subjective misunderstanding of the immigration consequences of her plea [was] corroborated" by her attempts to seek lawful immigration status 10 years after her plea, which was "not consistent with that of [an] individual[] who understood that their convictions made them presumptively deportable and ineligible for reentry into the United States"]; *Alatorre, supra,* 70 Cal.App.5th at p. 769 ["there can be little doubt in this case that [petitioner] never appreciated his plea and subsequent conviction made him *automatically* deportable" where he attempted "to become a naturalized citizen within three years of his conviction"].)  Nothing in the record here suggests that Meza encountered adverse immigration consequences before he consulted with an immigration firm.  (Cf. *People v. Diaz* (2022) 76 Cal.App.5th 102, 115 (*Diaz*) [affirming denial of section 1473.7 motion where immigration officials advised petitioner he was deportable right after his conviction and he "did not state that he was surprised, dismayed, or that he attempted to take any action to secure his legal status at that time"; petitioner's "inaction [was] inconsistent with his claim that he did not believe he would face any adverse immigration consequences"].)  Indeed, after his conviction, Meza did not go into hiding but continued to live in the United States, maintained gainful employment, and had another child, supporting that he did not expect automatic deportation as a result of his conviction.  (See *Espinoza, supra*, 14 Cal.5th at p. 320 [section 1473.7 relief warranted where "[a]fter his conviction, rather than living in hiding, [petitioner] started his own business, [and] joined community organizations"].)

Likewise, the available record does not reflect that Meza received personalized advice from his defense counsel as to the

15

immigration consequences of his plea.  Meza provided emails and letters demonstrating that he reached out to the public defender's office to request his case file and contact his former plea counsel, but his former counsel was retired, she did not respond to inquiries from the public defender's office, and an "exhaustive search" could not produce the defense file.  The record does not otherwise indicate any discussion of immigration consequences between Meza and his counsel.  (See, e.g., *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 659-660, 663 [denying section 1473.7 relief where plea counsel told the court that she had discussed immigration consequences with the petitioner and she believed he understood them, the court advised petitioner he would be deported, and petitioner replied " 'I understand.  I'm just going to wait for immigration.' "].)  Indeed, Meza's declaration that he did not discuss the immigration consequences with his counsel is the only evidence on this point.  Meza's assertion that his counsel did not advise him also aligns with the applicable law at the time of his plea: before the United States Supreme Court decided *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*), "there was no Sixth Amendment obligation on the part of defense counsel to affirmatively advise a defendant of the immigration consequences of a conviction."[4]  (*Carrillo, supra*, 101 Cal.App.5th at pp. 17-18

---

[4]    The superior court erred on this point.  The court concluded that Meza could not establish error as to his understanding of the immigration consequences because Meza pleaded guilty before *Padilla* and thus his "counsel was under no obligation to advise him" of immigration consequences.  But as stated, the error supporting section 1473.7 relief "need not be one made by defense counsel or the court but may be one made by *the moving party herself* if supported by contemporaneous evidence." (*People v.*

16

[concluding a section 1473.7 petitioner established subjective misunderstanding of the immigration consequences of his 2002 conviction because the petitioner and his trial attorney could not "recall any discussion of immigration consequences," which made sense under "then applicable law"].)

In *Espinoza*, our Supreme Court concluded that a section 1473.7 petitioner established prejudicial error under similar circumstances. (*Espinoza, supra*, 14 Cal.5th at p. 321.) There, the petitioner declared that his attorney " 'did not mention to me that my plea would have immigration consequences,' " the attorney's assistant told him "to plead no contest and 'everything was going to be fine,' " and he did not understand the trial court's immigration advisement to apply to him. (*Id.* at p. 318.) The California Supreme Court held the petitioner was "not required to provide the declaration of plea counsel" or "to submit contemporaneous documentation from the time of the plea," especially "15 years [after] the plea" and where the parties attempted to reach plea counsel "without success." (*Id.* at p. 325.) Here, the People contend that "[n]othing in the record corroborates a claim that [Meza's] counsel failed to advise, advised incorrectly, or otherwise induced the plea based on immigration misinformation," because there is "no declaration from his prior counsel, no defense file, and no contemporaneous objective evidence supporting [the] claim."[5] But Meza diligently

---

*Rodriguez* (2021) 68 Cal.App.5th 301, 311; see *Camacho, supra*, 32 Cal.App.5th at p. 1008 [ineffective assistance of counsel not required for relief].)

[5] The People additionally argue that the superior court found Meza's declaration was not credible, and that we should not

17

attempted to contact his plea attorney and obtain his case file, and under *Espinoza*, such evidence is not a prerequisite for section 1473.7 relief, particularly given the 23 years since Meza's plea. (*Espinoza*, at p. 325.)

Finally, the prosecutor's immigration advisement does not conclusively establish that Meza subjectively understood the immigration consequences. As stated, the prosecutor advised that "if [Meza was] not a United States citizen," the conviction would "cause problems with immigration," he would "not be able to become a citizen" or "have any type of legal status here," he would "be deported" and would "not be able to come back into the country if you leave." Under section 1016.5, Meza's plea colloquy was required to include this advisement.[6]

---

" 'second-guess' " this " 'factual finding[].' " But, as stated, the superior court did not hear any testimony at the hearing on Meza's motion but merely considered Meza's declaration, the plea transcript, and other documentary evidence. Under *Vivar*, we defer only to "factual determinations that are based on ' "the credibility of witnesses the [superior court] heard and observed." ' " (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528 [appellate and superior courts " 'are in the same position in interpreting written declarations' [and] reviewing a cold record"].)

[6] At the time of Meza's plea, section 1016.5 provided, in relevant part, "Prior to acceptance of a plea of guilty or nolo contendere to any offense punishable as a crime under state law, . . . the court shall administer the following advisement on the record to the defendant: [¶] If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

While the prosecutor's admonishment described the immigration consequences attendant to Meza's conviction, Meza alleges that he did not understand the advisement because he did not receive personal advice on the matter from his attorney, and he had previously been convicted of the same offense without immigration consequences. "[D]epending on the surrounding circumstances, even [a] warning that deportation ' "*will* result" ' is not a categorical bar to relief." (*People v. Lopez* (2021) 66 Cal.App.5th 561, 577; accord, *Espinoza*, *supra*, 14 Cal.5th at p. 320 ["general advisement under section 1016.5" does not establish meaningful understanding of immigration consequences]; *Padron*, *supra*, 109 Cal.App.5th at p. 962 [same]; *Camacho*, *supra*, 32 Cal.App.5th at p. 1011, fn. 8 [petitioner may "present[] sufficient evidence of his lack of understanding such that the court's advisement cannot be taken as irrebuttable proof that defendant likely would have entered his plea notwithstanding [adverse immigration] consequences"].)

The People concede the prosecutor's immigration advisement "may not necessarily present an insurmountable barrier to bringing a successful section 1473.7 claim," but they argue that Meza cannot demonstrate his lack of understanding because the advisement was "clear and unequivocal" and Meza did not "express[] confusion or questions at the time the advisements were given." In *Espinoza*, however, the high court held that evidence of a petitioner's "contemporaneous confusion" about immigration consequences during the plea proceedings was not required where the petitioner averred "he did not discover

_____

(Former § 1016.5, subd. (a), as enacted by Stats. 1977, ch. 1088, p. 3495, § 1.)

19

those consequences until more than a decade after his plea." (*Espinoza*, *supra*, 14 Cal.5th at pp. 324-325.)

Here, Meza similarly attested he did not understand the court's advisement until more than 20 years after his guilty plea, and in the meantime he lived his life openly in the United States, where he continued to put down roots in his community. Meza's silence at the plea hearing thus does not establish that he understood the immigration advisement—nor does the plea hearing transcript otherwise reflect that Meza affirmatively understood the advisement. (Cf. *Diaz*, *supra*, 76 Cal.App.5th at pp. 114-115 [petitioner's claim that he did not understand immigration consequences of plea was not credible where petitioner "was aggressive in his self-advocacy at the plea hearing," "asked multiple questions, spoke directly to the court several times, and attempted to bargain directly with the court," but asked no questions to follow up on the prosecution's advice of immigration consequences]; *People v. Perez* (2018) 19 Cal.App.5th 818, 829-830 [same, where the petitioner raised his concern about deportation at the plea hearing and was advised of mandatory deportation by his attorney, by his plea form, and by the trial court].)

On the record before us, Meza has demonstrated by a preponderance of the evidence his subjective misunderstanding of the immigration consequences of his plea. (See *Espinoza*, *supra*, 14 Cal.5th at p. 320 [record established petitioner did not meaningfully understand the immigration consequences of his plea, despite trial court's "general advisement" that the conviction "may have immigration consequences," because petitioner's attorney "never advised him that pleading no contest to the charges at issue would result in his deportation," and

20

petitioner's post-plea behavior was "not consistent with the behavior of a person who understood that his convictions effectively ended his [lawful immigration] status"]; *Curiel*, *supra*, 92 Cal.App.5th at pp. 1175-1177 [same, despite court's statement that guilty plea " 'will result' in deportation," where petitioner received "inadequate and incomplete" immigration advice from plea counsel and defendant's "postplea conduct" demonstrated that she did not understand she was presumptively deportable and ineligible for reentry].)

D.    *Meza Established Prejudice*

Based on our independent review of the record, we also conclude that, considering the totality of the circumstances, Meza presented evidence demonstrating a reasonable probability he would have rejected the plea deal had he known of its consequences to his immigration status.  (See *Vivar*, *supra*, 11 Cal.5th at p. 529.)  Meza argues he established a reasonable possibility he would have rejected the plea had he meaningfully understood its immigration consequences, based on his "strong personal ties to the United States."

Meza attested that had he "known that the case was going to cause . . . severe [immigration] consequence[s], [he] would have requested that we seek other options such as an immigration safe plea or taken the case to trial.  I would have been willing to risk going to trial and getting more time in jail if it meant I could avoid these severe immigration consequences."  As stated, to establish prejudice, Meza must corroborate his "assertions with ' " 'objective evidence.' " ' "  (*Espinoza*, *supra*, 14 Cal.5th at p. 316.)

21

"Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. . . . Depending on the strength of a defendant's community ties, 'the prospect of deportation' may be ' "an integral part" ' or ' "the most important part" ' of the defendant's 'calculus in responding to certain criminal charges.' [Citation.] Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment. [Citations.] Objective evidence of a defendant's community ties includes facts provided by a defendant's declaration." (*Espinoza, supra*, 14 Cal.5th at p. 321.)

In *Vivar, supra*, 11 Cal.5th 510, the high court held a section 1473.7 petitioner established prejudice in light of his lifelong connections to the United States. (*Id.* at p. 530.) The *Vivar* petitioner "was brought to this country at age six as a lawful resident, and he attended schools, formed a family, and remained here for 40 years. At the time of his plea, he had two children, two grandchildren, and a wife, all of whom are citizens." (*Ibid.*) In *Espinoza*, the petitioner established prejudice by showing he "ha[d] spent most of his life in the United States," he "came to California when he was 13 years old," his "wife and five children were United States citizens," his extended family lived in the United States, and he was "the financial provider for his family." (*Espinoza, supra*, 14 Cal.5th at p. 322.) After his plea, the petitioner "returned home to care for his family and community," "lend[ing] credence to [his] assertion that his community ties were important to him at the time of his plea." (*Id.* at p. 323.) These "deep and long-standing ties [were]

22

undisputed and weigh[ed] in favor of finding that [the petitioner] would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement." (*Id.* at p. 322.)

Meza's declaration established that at the time of his plea, Meza had resided in the United States for 10 years since he was 12 years old; he attended school and was gainfully employed; he had two young children, both United States citizens; and he financially supported his father, who also lived in the United States. After his plea, Meza continued to reside and work in the United States for more than 20 years, had another child (a United States citizen), and began a new relationship with his partner of 12 years, providing financial support to her and her two daughters. As in *Vivar* and *Espinoza*, these circumstances objectively corroborate Meza's claim that he would have renegotiated or rejected the plea to avoid "severe immigration consequences."

In assessing prejudicial error, we also consider "whether alternative, immigration-safe dispositions were available at the time of the defendant's plea. Factors relevant to this inquiry include the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences, and the existence of comparable offenses without immigration consequences. [Citations.] These matters can be placed in the record by either party." (*Espinoza, supra*, 14 Cal.5th at p. 323.)

Here, Meza's section 1473.7 motion and supporting declarations did not identify any potential immigration-neutral dispositions. The People thus argue that Meza failed to establish

23

a possibility of pleading to an immigration-neutral charge.  The People also assert that Meza faced a maximum sentencing exposure of nine years in prison, and that his plea was "a tremendous bargain because he avoided prison time."  (See §§ 136.1, subd. (c)(1), 273.5, subd. (f)(1).)

Meza points to his "unequivocal[]" declaration, which states:  "Had I known that the case was going to cause these severe consequence[s], I would have requested that we seek other options such as an immigration safe plea or taken the case to trial.  I would have been willing to risk going to trial and getting more time in jail if it meant I could avoid these severe immigration consequences."  Meza further declared, "The United States is my home and it has been since the age of 12."  Meza contends that because the defense case file is unavailable despite his diligent efforts to obtain it from his prior counsel, he is unable to provide any details about the plea negotiations.

Looking to the totality of the circumstances, we conclude Meza has sufficiently demonstrated a "reasonable probability that [he] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.)  As stated, a reasonable probability "does not mean more likely than not," but "merely a reasonable chance, which is more than an abstract possibility." (*Carrillo*, *supra*, 101 Cal.App.5th at p. 19.)  A petitioner "may show prejudice by 'convinc[ing] the court [that he] would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow.' " (*Camacho*, *supra*, 32 Cal.App.5th at p. 1010.)

24

As discussed, Meza established strong ties to the United States at the time of his plea: his 10-year residence in this country since the age of 12, consistent work history since he turned 18, his status as the financial provider for his family, his two United States citizen children under the age of five, and his father's residence in the United States. Meza's declaration further indicated that avoiding automatic deportation from the United States was his top priority. (See *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 79 [finding prejudice where petitioner's "declaration ma[de] clear that he wanted to avoid deportation at all costs, such that he would have rejected a scenario of automatic deportation—pleading guilty . . . —in favor of a scenario of possible deportation—defending his case at trial, regardless of the other potential consequences (a longer prison sentence)"].) Finally, we note that Meza pleaded guilty before the court held a preliminary hearing on the charges, suggesting further negotiations were possible. (See *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 326 [petitioner demonstrated reasonable probability of rejecting plea deal in hope of immigration-neutral plea where she pleaded guilty early in proceedings and "never tested the prosecution's resolve"].) These circumstances demonstrate prejudice and warrant section 1473.7 relief. (See *Villalba, supra,* 89 Cal.App.5th at pp. 674-675 [finding section 1473.7 petitioner demonstrated prejudice, where his strong "ties to the United States" corroborated his declaration that "he would have risked trial and additional jail or prison time in order to avoid deportation," absent any showing of a potential immigration-neutral disposition]; *Camacho, supra,* 32 Cal.App.5th at pp. 1011-1012 [same].)

## DISPOSITION

The order denying Meza's section 1473.7 motion is reversed, and the case is remanded with instructions to grant the motion, vacate the conviction, and permit Meza to withdraw his plea and to enter a different plea.


MARTINEZ, P. J.

We concur:


STONE, J.                              GIZA, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.